UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| United States of America | Criminal No. 3:11cr60 (JBA) |
| --- | --- |
| v. | September 2, 2011 |
| Nicola Melia | |

RULING ON MOTION *IN LIMINE* TO EXCLUDE EVIDENCE

Defendant Nicola Melia moves to exclude [Doc. # 28] from evidence: 1) his 2006 racketeering conviction; 2) his son Philip's assault on the informant in this case ("AT"); 3) AT's accounts of Defendant's prior violent conduct and associations with violence; and 4) AT's notebook purportedly keeping track of his interest payments to Melia. At oral argument the Defendant and the Government came to agreements with regard to the Defendant's 2006 conviction, Philip Melia's assault on AT, and AT's notebook. For the reasons that follow, Defendant's motion to exclude AT's accounts of Defendant's violence and violent associations will be denied under the conditions set out below.

I.  The Government's Allegations

The Government charges Melia with knowingly attempting to collect an extension of credit by extortionate means in violation of 18 U.S.C. § 894. The bases of the Government's allegations are that Melia made several high–interest loans to AT between 2000 and 2011 and, as reflected in five recorded conversations between October 2010 and March 2011, used extortionate means to attempt to collect payments and interest on those loans through implicit threats to AT that certain individuals, including members of New York crime families, "Big Anthony," and Melia's son Philip, would physically harm AT if AT

did not make timely interest payments to Melia, despite Melia's promises to "protect" AT and his claims to AT that he "said no way" to the Bonanno Crime Family's desire to hurt AT.

Beginning in May 2000, after vouching for an associate who had taken out a loan from Melia and subsequently disappeared, AT began making interest payments of $600 a week on behalf of this associate. (Resp. [Doc. # 38] at 2–3.) He made these payments from May 13, 2000 to March 15, 2008 and then began making payments of $1,100 a week from March 22, 2008 to April 4, 2009; he recorded these payments in a notebook. (*Id.* at 3.) According to the Government's calculations, AT paid over $308,300 in interest on this loan, but Melia would not allow him to pay off the principal. (*Id.*)

The Government further alleges that in mid–2009, Melia provided AT with three loans, in the amounts of $15,000, $100,000, and $30,000. (*Id.* at 4.) In September, 2009, AT began having difficulty making weekly interest payments to Melia. (*Id.* at 5.) In late 2009 or early 2010, an acquaintance of AT ("John Doe 1") asked AT about potential targets for robbery. (Mot. to Exclude at 11; Resp. at 5.) AT told John Doe 1 that Melia would be a good target and the two spoke on the phone three or four times about committing a robbery at Melia's home. (Ex. D to Mot. to Exclude at 4.) AT and John Doe 1 conducted a "drive by" of Melia's home together prior to the robbery. (*Id.*) AT rented a van for John Doe 1 to use in the robbery and told him that there might be a safe in Melia's bedroom that should contain a large sum of money but did not otherwise participate in the robbery or discuss details of the robbery with John Doe 1. (*Id.* at 4–5.) On March 2, 2010, John Doe 1 and two other men used the van rented by AT to drive to Melia's home and proceeded to forcibly enter the home, assault Melia, and steal money, jewelry, and other items. (*Id.*; Resp. at 5–6.) Melia held AT responsible for the robbery. (Mot. to Exclude at 12–13.) In April 2010, while

2

AT was driving a truck outside his business, Phil Melia attacked him through a side window of the truck at struck him repeatedly on the head and face with a metal wrench. (*Id.*, Ex. D at 5; Resp. at 6.)

In October 2010, AT missed more weekly interest payments and began fearing for his safety; he then began serving as a cooperating witness for the FBI. (*Id.* at 6.) From October 2010 to March 2011 the FBI consensually recorded AT's meetings with Melia during five of which the Government alleges Melia told AT that if he did not make timely payments, various individuals from New York and/or Philip Melia would physically harm him. (*Id.*)

II. Discussion

    A. Agreed–Upon Evidence

During oral argument the parties reached an agreement as to the admissibility and/or acceptable use of evidence of the Defendant's 2006 racketeering conviction, Philip Melia's assault on AT, and AT's interest–payment notebook.

        *1. Defendant's 2006 conviction*

The Government stated in its Response to Defendant's Pretrial Motions and reiterated at oral argument that its decision to introduce his 2006 conviction in *United States v. Melia*, 3:04cr28 (JBA), will depend on the defense presented at trial; only if Defendant claims that he was a stranger to the world of "street loans" will the Government seek to introduce the conviction into evidence. Defendant's motion to exclude this evidence is therefore denied as premature without prejudice to renew if the Government indicates that it is seeking to offer the 2006 conviction.

### 2. *Philip Melia's assault*

Defense counsel stated at oral argument that he "really [did]n't have a problem" with the Government introducing evidence of Philip Melia's assault on AT in April 2010 and agreed with the Court that he no longer contested the admissibility of this evidence. Pursuant to this understanding, Defendant's motion to exclude this evidence is deemed withdrawn.

### 3. *AT's notebook*

Defendant objects to AT's notebook being admitted into evidence as an exhibit under the business records hearsay exception of Fed. R. Evid. 803(6). His counsel, however, assented to the proposal that the Court allow the notebook to be read into evidence as recorded recollection under Fed. R. Evid. 803(5) if AT is unable to recall his interest payments to Defendant while testifying at trial. Defendant's motion to exclude this evidence is therefore denied; the Government will be allowed to read the notebook into evidence as needed as a recorded collection.

B.  AT's Testimony Regarding Defendant's Prior Violent Conduct

Defendant moves to exclude AT's wide–ranging testimony of Defendant's prior bad acts, arguing that they consist of hearsay and speculation and are irrelevant because the extortion at issue has been tape–recorded. He contends that the jury should make its determination as to whether his statements to AT during their recorded conversations were threats based on those conversations alone, without any testimony from AT as to whether and why he feared Defendant. The Government clarifies in response that it seeks only to introduce AT's personal knowledge of Defendant's involvement in violence and argues that this evidence provides the necessary factual context for the jury to understand the intent of

Melia's statements, in light of AT's awareness of Defendant's history with violence, as actions which would reasonably induce fear in an ordinary person. The Government seeks specifically to elicit testimony from AT regarding six categories of Defendant's prior violent conduct and associations with others who performed violent acts:

(1) Defendant's statement to AT that he had arranged for a bomb to be placed under the car of Gene Rizzi in the 1980s;

(2) Defendant's enlisting of AT to help him find someone to kill Gene Rizzi, subsequent to which AT hired an individual named Noel to shoot Rizzi;

(3) An incident between 2001–2003 in which Defendant asked AT to accompany him to pick up money from a debtor who owned a pizza restaurant in Bridgeport, told AT that the debtor owed him a large sum of money and that he intended to hit him with a rolling pin, and after they arrived at the restaurant to find the debtor missing, screamed at a woman working there and slapped his hands on the counter to intimidate her;

(4) AT's association through Defendant and Philip Melia with "Big Anthony" and "Big Vinny," individuals involved in organized crime who committed acts of violence on behalf of Defendant and his son;

(5) A meeting that AT attended between Defendant and Russell Cappozziello, Jr. in which Cappozziello paid Defendant $10,000 in exchange for Defendant's agreement to commit no further acts of violence against his family after Defendant had previously directed a third party to assault Cappozziello because he had not returned a pay loader to Richard Testa; and

(6) Defendant's statements to AT that the Gambino Crime Family had twice given Defendant the opportunity to become a "made member" of the family but he had declined, that Defendant is associated with an organized crime family in Canada known as the "Zips," and that AT has been physically present when Defendant has been in the company of organized crime figures.

Pursuant to 18 U.S.C. § 894(a) "[w]hoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means (1) to collect or attempt to collect any extension of credit, or (2) to punish any person for the nonrepayment thereof, shall be fined under this title or imprisoned not more than 20 years, or both." "Extortionate means" is defined as "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person." 18 U.S.C. § 891(7). As the extortionate threat may be either express or implicit, evidence of a threat of violence includes not only a defendant's acrimonious and intimidating language or actions, but his penchant for violent behavior such that it intentionally instills a fear of similar violent consequences in his debtor. *See* 2 L. Sand, *et al.*, Modern Federal Jury Instructions–Criminal ¶ 32.02, Cmt. to Instruction 32–8 (citing *United States v. DiSalvo*, 34 F.3d 1204 (3d Cir. 1994); *United States v. Spears*, 568 F.2d 799 (10th Cir. 1978)) ("[T]he threat of violent consequences may be demonstrated by the general nature of the loan and the collection transaction and by the defendant's reputation in the community.")

Any act or statement by a defendant, regardless of its form as presented to the debtor, can serve as the basis of an implied threat. *See United States v. Sears*, 544 F.2d 585, 587 (2d Cir. 1976) (quoting, with approval, the district court's instruction on 18 U.S.C. § 894:

"Extortion as far as this statute is concerned includes any act or statement which constitutes a threat if it instills fear in the person to whom they [sic] are directed or are reasonably calculated to do so in the light of the surrounding circumstances."). To that end, reputation is admissible insofar as it forms the basis of an implied threat. *See Disalvo*, 34 F.3d at 1214. Evidence of a defendant's violent character and connections with violent acquaintances are relevant to whether he intended his statements to be taken in the context of his violent reputations so as to constitute an implicit threat. *United States v. Polizzi*, 801 F.3d 1543, 1555–56 (9th Cir. 1986) ("The evidence presented at trial regarding Matranga's violent character and his self–proclaimed Mafia connections was relevant to the issue of whether Matranga used extortionate means to collect extensions of credit in violation of section 894, and was properly admissible.").

AT's awareness of Defendant's penchant for and association with acts of violence (as outlined in the Government's six categories of testimony outlined above), particularly as they relate to Defendant's use of violence in connection with lending and his willingness to hire others to commit acts of violence at his behest, form the bases of the implicit threats that the Government alleges Defendant made to AT in an attempt to collect interest payments. The jury in this case will be tasked with interpreting the recorded conversations between Defendant and AT and deciding whether the Government has proved that the words used by Defendant during those conversations contain implicit extortionate threats. The existence, or not, of those threats must be assessed in the context of what AT knows of Defendant's association with and willingness to use violence, and what Defendant knows of AT's awareness about his prior violent conduct.

The Government will therefore be permitted to elicit testimony from AT in the six categories listed above regarding AT's knowledge of Defendant's prior involvement with violence. Evidence of any other prior bad acts by the Defendant that do not fall within AT's knowledge of Defendant's violent history do not appear to fit the Government's theory of admissibility at this time and will be excluded unless other proper foundation is laid. Defendant's motion to exclude AT's accounts of Defendant's prior bad acts is therefore granted in part and denied in part.

III. Conclusion

For the reasons stated above, Defendant's motion [Doc. # 28] *in limine* to exclude evidence is GRANTED in part and DENIED in part.

IT IS SO ORDERED.

/s/
———————————————
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 2nd day of September, 2011.